## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

Freida Keyes,                                       :          Case No. 1:11CV00312

       Plaintiff,                                :

v.                                                  :

Commissioner of Social Security,                    :          **MAGISTRATE'S REPORT AND**
                                                               **RECOMMENDATION**

       Defendant.                                :

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) filed pursuant to Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 16, 17 and 20).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

### I.  PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on October 31, 2006 alleging that she became unable to work because of her disabling condition on October 1, 2004 (Docket No. 10, Exhibit 7, pp. 2-4 of 15; 7-9 of 15).  Plaintiff's requests for benefits were denied initially and upon reconsideration (Docket No.

10, Exhibit 5, pp. 2-4 of 28; 5-7 of 28, 11-13 of 38; 14 -16 of 28).  Plaintiff, represented by counsel, and Vocational Expert (VE) Ted Macy appeared and testified at an administrative hearing (Docket No. 10, Attachment 3, p. 2 of 42).  Administrative Law Judge (ALJ) Stephen Hanekamp rendered an unfavorable decision on July 1, 2009 (Docket No. 10, Attachment 2, pp. 14-29 of 30).  The Appeals Council denied Plaintiff's request for review on December 15, 2010 (Docket No. 10, Attachment 2, pp. 2-4 of 30).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.


## II  FACTUAL BACKGROUND

An administrative hearing was conducted on May 1, 2009.  Plaintiff and VE Macy testified.


### A.    PLAINTIFF'S TESTIMONY.

At the time of hearing, Plaintiff was 49 years of age, she weighed 220 pounds and she was 5'7" tall.  After completing the eleventh grade year of high school, Plaintiff earned a general equivalency degree (GED).  Plaintiff had six children over the age of majority.  She and one of her daughters resided together (Docket No. 10, Attachment 3, pp. 6-7, 21 of 42).

Plaintiff's impairments included angina (a severe, often constricting pain, usually referring to angina pectoris), diabetes mellitus II, diaphoresis (excessive perspiration), dizziness, dyspnea (shortness of breath), hypertension, nausea, chronic stomach, arm pain, right leg and thigh pain, and tremors.  Two to three times daily, Plaintiff experienced pain in her arm and shoulder.  She described the pain as a heavy weight on her chest that interfered with her ability to breathe.  Related to her chest pain were periodic episodes of pain in her arm, hands, right thigh, legs and side of her right foot.  The pain was intensified by elevated glucose levels.  However, the pain subsided after lying down for up to 1½ hours,

2

taking Tylenol®, applying a heating pad and/or elevating the affected body part (Docket No. 10, Attachment 3, pp. 12-13, 15-16, 22 of 42; STEDMAN'S MEDICAL DICTIONARY 22010, 110960, 12231 (27th ed. 2000). Once or more daily, Plaintiff experienced episodes of sweating, nausea, dyspnea, dizziness and trembling. Episodes of dyspnea typically lasted up to three hours. Plaintiff cried every day for no apparent reason. Occasionally Plaintiff became so upset when she cried that she "flipped out" (Docket No. 10, Attachment 3, pp. 15, 17 of 42). She used various methods of treating these symptoms, including consuming green tea, taking a cold shower and lying down. If she was extremely weak, she stayed in bed until the symptoms subsided (Docket No. 10, Attachment 3, p. 14 of 32). Plaintiff became hot, dizzy and unbalanced when in crowds. She also noticed the onset of these symptoms in the morning and during the middle of the night (Docket No. 10, Attachment 3, p. 16 of 42).

The list of medications consumed regularly included Glyburide (a medication used to control diabetes), Hydrochlorothiazide (a diuretic), Lexapro (a medication used to treat depression and generalized anxiety, excessive worry and tension of daily life), Lisinopril (an anti-hypertensive drug used alone or in combination with other medications to treat high blood pressure) and Nitroglycerin (a drug used to treat episodes of angina). Plaintiff did not elaborate on whether she had taken the dosage of Glyburide as prescribed or whether the dosage was maladjusted; however, it had not succeeded in lowering Plaintiff's blood glucose levels so she was slated to return to insulin shots. Plaintiff had taken Lexapro for three years. Although Plaintiff had chest pain, she had not used the Nitroglycerin because of the side effects (Docket No. 10, Attachment 3, pp. 17, 22 of 42; www.nih.gov).

It was Plaintiff's opinion that she could lift and carry occasionally up to eight pounds and she could stand at one time up to ten minutes. She estimated that she could sit up to twenty-five consecutive minutes before she had to reposition herself (Docket No. 10, Attachment 3, p. 18 of 42).

3

During a typical day, Plaintiff got up and her daughter made her breakfast.  Occasionally, she stared at the apartment walls or outside the apartment, then she read.  Plaintiff watched a minimal amount of television.  She talked to her daughter throughout the day.  Occasionally, her other children would come to visit for no more than thirty minutes to an hour (Docket No. 10, Attachment 3, p. 19 of 42).  Plaintiff dusted sometimes but her daughter maintained the overall cleanliness of their apartment (Docket No. 10, Attachment 3, p. 20 of 42).  Plaintiff guesstimated that she laid down for up to two hours four times daily (Docket No. 10, Attachment 3, p. 26 of 42).

Plaintiff had not operated a motor vehicle since 2003.  Plaintiff did not like to be left alone.  Neither did she go anywhere alone.  Plaintiff rarely left her home and when she did leave, she went to Project House, a medical communications administrator, to obtain medication or to keep an appointment with a physician (Docket No. 10, Attachment 3, pp. 19, 20, 29 of 42; www.projhouse.com).

Plaintiff's past relevant work included managerial experience and assembly line work.  For seven years, Plaintiff managed a gas station.  In that capacity, she supervised four employees and loaded coolers and cases of other product.  The work ended when the owner died and the business was sold (Docket No. 10, Attachment 3, pp. 7-8 of 42).

Plaintiff was employed full-time at a local Boys and Girls Club as an administrator.  She was the proverbial "jack of all trades," using her managerial and parenting skills to offer a comprehensive range of services for children by, *inter alia*, implementing educational and community programs, cooking for community programs, planning field trips, making school and juvenile detention visits and attending public school meetings (Docket No. 10, Attachment 3, pp. 9-10 of 42).

Although she was in pain, Plaintiff tried to work in 2005.  She was hospitalized two weeks after becoming employed (Docket No. 10, Attachment 3, p. 21 of 42).

In 2006, Plaintiff attempted to work but she was unable to perform the physical requirements of the job such as lifting, carrying and/or ascending three flights of stairs (Docket No. 10, Attachment 3, pp. 11-12 of 42).

      B.     VE'S TESTIMONY.

The ALJ asked the VE to assume a hypothetical person who was a younger individual of less than fifty years of age, with a GED, and past relevant work as a youth development professional, summer camp assistant and gas station manager, who was limited to a full range of light work and simple routine tasks, superficial interaction with co-workers, supervisors and the general public and no rigorous production pace or strict production standards.  The VE confirmed that this description would eliminate Plaintiff's past relevant work from the list of possible jobs that the hypothetical person could perform (Docket No. 10, Attachment 3, p. 31-32 of 42).  However, the hypothetical person could perform the following jobs found in the DICTIONARY OF OCCUPATIONAL TITLES (DOT):

| JOB | REFERENCE NUMBER IN DOT | JOB DESCRIPTION | NATIONAL AVAILABILITY | NORTHEAST OHIO AVAILABILITY |
|---|---|---|---|---|
| BENCH ASSEMBLER | 706.684-022 | PERFORMS ANY COMBINATION OF FOLLOWING REPETITIVE TASKS ON ASSEMBLY LINE TO MASS PRODUCE SMALL PRODUCTS, | 180,000 | 900 |
| WIRE WORKER | 728.684-022 | PERFORMS ANY COMBINATION OF FOLLOWING TASKS INVOLVED IN CUTTING, STRIPPING, TAPING, FORMING, AND SOLDERING WIRES OR WIRE LEADS OF COMPONENTS USED IN ELECTRICAL AND ELECTRONIC UNITS. | 190,000 | 1,200 |
| ELECTRONICS WORKER | 726.687-010 | PERFORMS ANY COMBINATION OF FOLLOWING TASKS TO CLEAN, TRIM, OR PREPARE COMPONENTS OR PARTS FOR ASSEMBLY BY OTHER WORKERS: | 90,000 | 600 |

(Docket No. 10, Attachment 3, pp. 32, 35 OF 42).

5

These jobs are not on an assembly line but there would be production expectations (Docket No. 10, Attachment 3, p. 36 of 42).  The ALJ opined that based on his experience, the highest level of tolerance on these jobs for the hypothetical person to "be off task" was eight to ten percent of the time.  Further, the VE opined that two absences from work monthly were on the cusp of acceptability for maintaining employment (Docket No. 10, Attachment 3, p. 33 of 42)

.                                  **III.  SUMMARY OF MEDICAL EVIDENCE**

Medical evidence is the cornerstone for the determination of a disability.  A summation of Plaintiff's physical and mental medical evaluations follows**.**

   **A.      PHYSICAL DISORDERS**

On January 28, 2005, Plaintiff presented to the emergency room complaining of chest pains that radiated to her left arm with dyspnea on exertion and cough associated with nausea and vomiting (Docket No. 10, Attachment 11, pp. 3-9 of 30).  The atypical chest discomfort and dyspnea were attributed to uncontrolled blood pressure as the chest X-ray showed no active disease (Docket No. 10, Attachment 22, p. 17 of 30).  The ill defined nodular infiltrate on the right lower lobe was suspected of being early inflammation of the lung tissue (Docket No. 10, Attachment 11, p. 26 of 30).

On October 6, 2004, November 3, 3004, February 4, 2005, March 17, 2005, October 7, 2005 and October 28, 2005, Dr. Vijay Rastogi, an internal medicine specialist, monitored Plaintiff's chest pains, blood pressure and diabetes.  Throughout the course of treatment, Dr. Rastogi worked with Dr. Robert J. Carson, Ph. D., a licensed social worker, in an attempt to regulate all of Plaintiff's medications and her consumption of each (Docket No. 10, Attachment 12, pp. 15-21 of 30).  On October 6, 2004, Dr. Rastogi noted that there were no chest pains, cough, or shortness of breath.  The dosage of medication used to control hypertension was modified and added to the regimen of other drugs (Docket No. 10,

Attachment 21, p. 13 of 13).

On March 17, 2005, Dr. Rastogi determined that Plaintiff had no chest pains. To sustain controlled hypertension, Lisinopril was added to Plaintiff's drug therapy (Docket No. 10, Attachment 21, p. 9 of 13; www.ncbi.nlm.nih.gov). On October 7, 2005, Dr. Rastogi ordered a comprehensive metabolic panel for comparison with panels conducted in October and November 2004. Plaintiff's cholesterol levels were consistently elevated (Docket No. 10, Attachment 12, p. 29 of 30). Dr. Rastogi prescribed medication to assist with sustaining acceptable blood pressure levels (Docket No. 10, Attachment 12, pp. 29-30 of 30; Attachment 21, p. 8 of 13). In October 2005, Dr. Rastogi noted that the episodes of chest pains or shortness of breath had abated. The results from the thyroid panel were normal (Docket No. 10, Attachment 21, p. 7 of 13; Attachment 27, p. 9 of 12).

Plaintiff was treated at the emergency room on May 31, 2006 for symptoms related to atypical chest pain (Docket No. 10, Attachment 13, pp. 3-7 of 20; Attachment 22, p. 2 of 32). Dyspnea was most likely related to acute bronchitis with a spasmodic concentration of the muscular walls of the bronchial air passages to the lungs. The cardiac enzymes were normal. The recent stress test was also negative. There were no new cardiogram changes (Docket No. 10, Attachment 13, p. 7 of 20; www.webmd.com).

On May 31, 2006, June 1, 2006 and June 2, 2006, Plaintiff's glucose levels exceeded the reference amount (Docket No. 10, Attachment 13, p. 10 of 30). On June 2, 2006, Plaintiff's white blood count exceeded the normal reference amount (Docket No. 10, Attachment 13, p. 15 of 20). Plaintiff underwent an echocardiogram on June 2, 2006, the left ventricular estimated ejection fraction was 70% and the ventricle did not reveal evidence of regional wall motion abnormalities (Docket No. 10, Attachment 13, p. 18 of 20; Attachment 14, p. 2 of 13; www.healthgrades.com/physician/dr-obinna-isiguzo). The results from the myocardial perfusion study administered on June 2, 2006, were abnormal,

showing partially reversible anterior wall perfusion defect and fixed inferior wall defect (Docket No. 10, Attachment 23, pp. 7-10 of 30).

On October 4, 2006, Plaintiff was diagnosed with respiratory failure secondary to pulmonary edema.  Treatment included nitroglycerin infusion.  While hospitalized, Plaintiff underwent a cardiac catheterization.  The pulmonary artery study conducted on October 4, 2006, showed no evidence of filling defect or embolus in the main pulmonary artery, bilateral pulmonary arteries or interlobar pulmonary arteries.  The urinalysis showed an elevation of Plaintiff's white blood count.  Plaintiff's glucose levels were elevated on October 4 and October 5, 2006 (Docket No. 10, Attachment 15, pp. 7-10 of 29; Attachment 16, pp. 24, 26 of 26; Attachment 17, pp. 6, 14-15 of 21).  An endotracheal tube was placed to clear Plaintiff's airways (Docket No. 10, Attachment 17, p. 13 of 21).  The chest X-ray conducted on October 5, 2006 showed increasing prominence of the right peri-hilar and lower lobe capacity which could represent residual pulmonary edema versus a pulmonary infiltrate (Docket No. 10, Attachment 17, p. 18 of 21).

On October 19, 2006, Plaintiff reported no chest pains or shortness of breath.  Plaintiff was concentrating on stopping smoking (Docket No. 10, Attachment 21, p. 4 of 13).

Dr. Paul Holcomb, M. D., a cardiologist, conducted medical imaging tests used to determine cardiac function and examine the arteries on December 8, 2006.  The results showed that Plaintiff had minimal coronary artery disease and normal left ventricular function.  He recommended that Plaintiff undergo risk factor management (Docket No. 10, Attachment 27, p. 12 of 12; www.nlm.nih.gov).

Dr. James W. Gahman, M. D., a family practitioner, opined on February 1, 2007 that Plaintiff could:

- Occasionally lift and/or carry twenty pounds.
- Frequently lift and/or carry ten pounds.

- Stand and/or walk for a total of about six hours in an eight-hour workday.
- Sit for a total of about six hours in an eight-hour workday.
- Push and/or pull on an unlimited basis, other than as shown for lift and/or carry.
- Frequently climb using a ramp/stairs.
- Never balance.

- It was Dr. Gahman's opinion that Plaintiff had:

  - No manipulative limitations.
  - No visual limitations.
  - No communicative limitations.

Plaintiff should avoid concentrated exposure to extreme cold, extreme heat and fumes, odors, dust, gases and poor ventilation.

(Docket No. 10, Attachment 23, pp. 14-21 of 30; www.healthgrades.com/physician/dr-james-gahman).

At the Huron Hospital, Plaintiff was treated on February 28, 2007 for persistent dizziness, blurred vision and headaches by attending physician Dr. Ludmila N. Kaplan, M. D., an internal medicine specialist. Plaintiff's diagnosis was based, in part, on uncontrolled hypertension and diabetes. Her physician referred her to a comprehensive diabetes management program (Docket No. 10, Attachment 24, pp. 25-28 of 34; www.healthgrades.com/physican/dr-ludmila-kaplan).

On April 11, 2007, Plaintiff presented to the Huron Hospital with severe pain. Dr. Kaplan addressed issues with Plaintiff's uncontrolled hypertension and diabetes (Docket No. 10, Attachment 24, pp. 28-33 of 34). Results from the thyroid gland sonogram, a diagnostic medical image created using ultrasound echo equipment, performed on April 23, 2007, showed no significant abnormality (Docket No. 10, Attachment 24, p. 34 of 34; en.wikipedia.org/wiki/sonogram).

On April 24, 2007, Plaintiff began undergoing episodes of dyspnea. She sought medical treatment on April 27, 2007. Dr. Kaplan addressed the presence of cardiac asthma and attributed it to fluid overload that was attributed to noncompliance with conditions of drug therapy. During her entire

9

hospital stay, Plaintiff's glucose levels were above normal.  Treatment was employed to manage Plaintiff's diabetes and hypertension (Docket No. 10, Attachment 25, pp. 2-21 of 29).

On June 6, 2007, Dr. Kaplan treated Plainitff for profuse sweating.  The medical care providers considered that sweating was a possible side effect of Metformin, a medication to treat type two diabetes.  Plaintiff's hypertension remained uncontrolled (Docket No. 10, Attachment 25, p. 27 of 29; www.nih.gov).

On August 15, 2007, Dr. Kaplan noted that Plaintiff's diabetes and hypertension were still uncontrolled.  Apparently, Plaintiff was not compliant with the medications or requested dietary changes (Docket No. 10, Attachment 25, pp. 28-29 of 29).

Plaintiff was treated for upper right flank pain that radiated to her back on September 20, 2007.  Narcotic pain relief was prescribed.  The X-rays of Plaintiff's lumbar spine and chest showed normal results.  However, Plaintiff's glucose level was exceedingly high, her red blood cell distribution level and mean platelet volumes were high and her potassium level was low (Docket No. 10, Attachment 26, pp. 3-14 of 31).

Plaintiff presented to the Huron Hospital Outpatient Department on October 17, 2007, in stable condition.  Dr. Kaplan was the admitting physician.  His treatment focus was on Plaintiff's elevated blood sugars and borderline normal hypertension.  The dosage of Glyburide was increased (Docket No. 10, Attachment 26, pp. 19-21 of 31).

Dr. Kaplan determined on January 16, 2008, that Plaintiff's diabetes was poorly controlled and her blood pressure was high.  Plaintiff was advised to quit smoking, exercise and eat a diet lower  in cholesterol (Docket No. 10, Attachment 27, p. 6 of 12).

On March 12, 2008, Dr. Kaplan certified on a Department of Job and Family Services Basic Medical Form, that Plaintiff had a history of treatment for diabetes, hypertension, hypertensive heart

disease and depression.  There were no gross physical defects or abnormalities, however, Plaintiff would have difficulty standing for more than thirty minutes with leg cramps and unsteadiness (Docket No. 10, Attachment 26, pp. 24-25 of 31).

Dr. Kaplan also completed a DIABETES MELLITUS RESIDUAL FUNCTIONAL CAPACITY QUESTIONNAIRE, in which he opined that Plaintiff had the following physical symptoms:

- Fatigue;
- Episodic vision/blurriness;
- Bladder infections;
- Dizziness/loss of balance; and
- Vascular disease/leg cramping.

It was Dr. Kaplan's opinion that Plaintiff became emotional/irritable with the slightest stress; however, these emotional factors did not contribute to the severity of Plaintiff's symptoms and functional limitations (Docket No. 10, Attachment 26, pp. 27-28 of 31).  Dr. Kaplan further opined that:

- Plaintiff could walk less than one block without rest or severe pain;
- Plaintiff could continuously sit for thirty minutes and stand at one time for one hour;
- Plaintiff could sit less than two hours;
- Plaintiff could stand/walk less than two hours;
- Plaintiff needed a job that included periods of walking around approximately 45 minutes per day for five minutes each time;
- Plaintiff needed to take occasional breaks on the average of ten minutes each before returning to work;
- Plaintiff could lift and carry in a competitive work situation less than ten pounds frequently; and
- Plaintiff could stop and crouch less than five percent during the eight-hour working day;

(Docket No. 10, Attachment 26, pp. 28-29 of 31).

On July 2, 2008, Plaintiff underwent a follow-up visit to check her blood pressure.  Attending physician Dr. Michael B. Ganz, M. D., a nephrology and internal medicine specialist, determined Plaintiff's condition was deteriorating (Docket No. 10, Attachment 26, p. 4 of 12).  On August 11, 2008, Dr. Ganz related Plaintiff's atypical chest pain to gastroesophageal reflux disease (Docket No. 10, Attachment 28, p. 14 of 22; www.healthgrades.com/physician/dr-michael-ganz).

11

On August 27, 2008, Dr. Yael Dinar-Kushnir, M. D., an ophthalmologist, diagnosed Plaintiff with presbyopia, a condition in which the lens of the eye loses its ability to focus thereby making it difficult to see close objects.  Dr. Dinar-Kushnir questioned whether the swelling in Plaintiff's eyelids could be attributed to allergies, sinuses or a thyroid abnormality (Docket No. 10, Attachment 28, p. 11 of 22; www.ncbi.nlm.nih.gov; www.healthgrades.com/physician/dr-yael-dinar-kushnir)

On September 22, 2008, Dr. Ganz opined that Plaintiff's condition was stable.  Specifically, her blood pressure was controlled.  Her diabetes was not controlled (Docket No. 10, Attachment 28, p. 5 of 22).

Plaintiff presented to the emergency room on February 18, 2009 with complaints of chest pain.  Her chest pain was resolved without invasive procedures or surgeries (Docket No. 10, Attachment 29, pp. 3-14 of 14).

### B.    MENTAL DISORDERS

Plaintiff underwent a mental evaluation on September 8, 2004.  She admitted that during the past two weeks, she had been tearful, experienced feelings of hopelessness and had a poor appetite.  Plaintiff had several stressors in her life including her sister's disappearance and parent's death (Docket No. 10, Attachment 12, p. 5 of 30).  Dr. Carson, Ph.D. opined that on September 8, 2004, Plaintiff had major psychosocial and environmental problems as identified by a global assessment of functioning (GAF) score that ranged between 41 and 60.  GAF is a reflection of the evaluating clinician's judgment of a patient's ability to function in daily life.  The 100-point scale measures psychological, social and occupational functioning.  Dr. Carson's determination that Plaintiff's score ranged from 41 through 60 denotes that she had serious to moderate symptoms, suicidal ideations, extreme difficulty in work, school or social functioning and a moderate suicide risk.  On November 3, 2004, Dr. Carson opined that Plaintiff had mild symptoms which were indicative of fleeting suicidal thoughts, some difficulty in

12

work, school or school functioning and low moderate risk of suicide (Docket No. 10, Attachment 12, pp. 8, 14 of 30; psyweb.com).

On October 6, 2004, Plaintiff's symptoms had improved.  There was the presence of mild symptoms charactered by fleeting thoughts of suicide, some difficulty in work, school and social functioning and low moderate risks of suicide.  Plaintiff was started on Zoloft, a medication to treat depression (Docket No. 10, Attachment 12, p. 12 of 30).

On February 16, 2007, Dr. Donald S. Leventhal, Ph. D., a psychological consultant, conducted a clinical interview of Plaintiff without the aid of an assistant or supervisor or diagnostic tests. Publishing the results of his interview to Dr. James Raia, Ph. D., the chief psychological consultant for the Bureau of Disability Determination, Dr. Leventhal claimed that he considered Plaintiff's recitations of her family history, health history, educational history, community history, employment history, and rehabilitation history.  Dr. Leventhal made observations about Plaintiff's appearance and behavior, flow of conversation and thought, affect and mood, anxiety, mental content, concerns about her physical health, orientation as to time, place and person, cognitive functioning, insight and judgment and daily activities (Docket No. 10, Attachment 23, pp. 22-27, 29 of 30; www.healthcare.com/profile/donald-stewart-leventhal).

The results were that Dr. Leventhal diagnosed Plaintiff with a major depressive disorder, single episode, severe without psychotic features.  On the date of examination, Dr. Leventhal observed that Plaintiff's current global assessment of functioning was 41, a score that denoted serious symptoms or any serious impairment in social, occupational, or school functioning.  Dr. Leventhal concluded that:

- Plaintiff's mental ability to relate to others was markedly impaired due to Plaintiff's depression and short temper;
- Plaintiff's mental ability to understand, remember and follow instructions was markedly impaired;
- Plaintiff's mental ability to maintain attention, concentration, persistence and pace to

13

perform simple repetitive tasks is believed to be markedly impaired due to depression, as well as impairments in short-term memory and concentration; and

• Plaintiff's mental ability to withstand the day-to-day work activity was believed to be markedly impaired due to the combination of depression and impairments in short term memory and concentration.

(Docket No. 10, Attachment 23, pp. 28-29 of 30).

In late February 2007, Dr. Catherine Flynn, Psy. D., a clinical psychologist, opined that Plaintiff had an anxiety disorder, an affective disorder that was evidenced by depressive syndrome which was characterized by feeling of guilt or worthlessness and thoughts of suicide and she had a mild depressive disorder with somatic overfocus (Docket No. 10, Attachment 24, pp. 5, 7 of 34; www.alltherapist.com/dr-catherine-flynn).  It was her opinion that Plaintiff had a moderate degree of limitations in the restriction of activities of daily living as a result of her mental impairment and that she had a mild degree of limitation in the difficulties of maintaining social functioning and maintaining concentration, persistence or pace (Docket No. 10, Attachment 24, p. 12 of 34).

From the evidence in the file, Dr. Flynn made the following summary conclusions that Plaintiff was moderately limited in the ability to:

• Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
• Complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; and
• Respond appropriately to changes in the work setting.

(Docket No. 10, Attachment 24, pp. 16-17 of 34).

### IV.  STANDARD OF DISABILITY.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920

14

respectively.  To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir.

15

2001)(internal citations omitted) (second alteration in original)).   If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S DECISION.

After consideration of the entire record, the ALJ determined:

1.  At step one of the sequential evaluation, Plaintiff met the insured status requirements of the Act through December 31, 2008 and she had not engaged in substantial gainful activity since October 1, 2004, the alleged onset date of her disability.

2.  At step two of the sequential evaluation, Plaintiff had severe impairments including hypertension, diabetes, obesity, musculoskeletal strain and depression.

3.  At step three of the sequential evaluation, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4.  At step four of the sequential evaluation, Plaintiff did not have an impairment or combination of impairments that prevented her from performing any past relevant work.

5.  At step five of the sequential evaluation, Plaintiff was capable of making the adjustment to other work that existed in the national economy; therefore, she was not disabled as defined under the Act.

(Docket No. 10, Attachment 2, pp. 17-29 of 30).

## VI. STANDARD OF REVIEW.

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).  The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)).  In fact the Commissioner's findings as to any fact shall be conclusive if

16

supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . .This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

## VII. THE PARTIES' POSITIONS.

Plaintiff contends that:

1. The ALJ violated the treating physician rule in rejecting Dr. Kaplan's residual functional capacity.
2. The ALJ's mental residual functional capacity is contrary to the medical evidence of record and impermissibly based on the ALJ's own lay opinion.

Defendant asserted the following responses:

1. Substantial evidence supports the ALJ's analysis of Plaintiff's impairments and what if any, limitations resulted from those impairments.
2. Plaintiff makes no mention of her mostly normal mental status findings.

## VIII. ANALYSIS OF TREATING PHYSICIAN RULE.

Plaintiff contends that the ALJ violated the treating physician rule in rejecting Dr. Kaplan's physical residual functional capacity. In response, Defendant argues that Dr. Kaplan's opinions are not

well supported by clinical findings or consistent with other clinical findings.

A.    THE TREATING PHYSICIAN RULE.

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight. *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir. 2007)). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007)). Opinions of a specialist with respect to the medical condition at issue are given more weight than a nonspecialist. *Johnson, supra*, (*citing* 20 C. F. R. § 404.1527(d)(5)).

B.    APPLICATION OF THE TREATING PHYSICIAN RULE TO THE ALJ'S DECISION.

The ALJ did properly apply the treating physician rule and articulate good reasons for the weight accorded Dr. Kaplan's opinions. The ALJ acknowledged that there was no evidence that Dr. Kaplan was inherently more familiar with Plaintiff's medical condition than other sources or that he had a

18

unique perspective on her condition.  He had only treated Plaintiff when she presented to the hospital

on six occasions–February 28, 2007, April 11, 2007, April 27, 2007, June 6, 2007, October 17, 2007 and

January 18, 2008.  Dr. Kaplan's treatment was limited to the subjective complaints of Plaintiff.

Accordingly, he addressed issues related to cardiac asthma such as profuse sweating and pain.  In

addressing the symptoms, Dr. Kaplan's treatment always focused on controlling Plaintiff's uncontrolled

hypertension and diabetes mellitus with drug therapy.  On March 12, 2008, Dr. Kaplan completed a

questionnaire based on this limited relationship with Plaintiff in which he speculated that her functional

limitations were severe.

The ALJ determined that Dr. Kaplan's opinions as a whole were not consistent with treatment

notes which did not support restricting Plaintiff's activities for any medical reason.  For instance, Dr.

Kaplan suggested that Plaintiff exercise.  This suggestion is not consistent with the severe degree of

physical limitation that Dr. Kaplan indicated.  The ALJ attributed greater weight to the content of Dr.

Kaplan's treatment notes as his thoughts and Plaintiff's complaints were memorialized during the course

of treatment.  In the questionnaire, Dr. Kaplan noted that Plaintiff became emotional with the slightest

stress.  He also opined that the emotional factors were not a factor in the severity of Plaintiff's symptoms

and functional limitations.  Although Dr. Kaplan consistently noted that Plaintiff had been prescribed

Lexapro a medication used to specifically treat anxiety and stressors, apparently he did not factor into

his assessment that she did not consistently take her medication.  Accordingly, the ALJ concluded that

Dr. Kaplan exaggerated the significance of Plaintiff's controllable impairments when completing the

standardized form of functional limitations.

Further, the ALJ determined that the standardized form completed by Dr. Kaplan was only

marginally useful for purposes of creating a meaningful and reviewable factual record.  The

supportability of Dr. Kaplan's opinions was lacking as he performed no medically acceptable clinical

or laboratory diagnostic techniques from which a reasonable critique of Plaintiff's physical impairments could be evaluated.  Dr. Kaplan's review of Plaintiff's medically determinable impairments–diabetes, hypertension and depression--could not be reasonably expected to limit her functions to the extent indicated.

The Magistrate is persuaded that the ALJ did not usurp Dr. Kaplan's role.  The ALJ considered Dr. Kaplan's as a treating physician and applied the correct legal standard to rebut the presumption that Dr. Kaplan's opinions were entitled to controlling weight.  Therefore, this Court must affirm the Commissioner's decision to give less than controlling weight to Dr. Kaplan's opinions as the Commissioner's decision is supported by substantial evidence.

### IX. ANALYSIS OF THE CONSULTATIVE EXAMINER RULE.

Plaintiff's challenges "the ALJ's deprecation" of the opinions of Dr. Leventhal, a consultative examiner.  Defendant argues that Plaintiff presented to Dr. Leventhal one year after her last therapy session.  Dr. Leventhal examined Plaintiff without knowledge of additional reports or repeatedly normal psychiatric findings throughout the record.  Dr. Leventhal's opinions were not consistent with the record evidence.

#### A.    THE WEIGHT GIVEN TO THE CONSULTATIVE EXAMINATION.

Because state agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 C.F.R. §§ 404.1527(f) and 416.927(f) require the ALJ and Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. *Newbern v. Commissioner of Social Security*, 2011 WL 1215167, *8 (N. D. Ohio 2011) (*citing* TITLE II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT, SSR 96–6p, 1996 WL 374180, *2 (July 2, 1996)).  ALJs are not bound by findings made by state agency or other program

20

physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.  *Id*.

B.    APPLICATION OF THE CONSULTATIVE EXAMINER STANDARDS TO PLAINTIFF'S CLAIM.

The ALJ did not ignore Dr. Leventhal's opinions.  Neither was he bound by Dr. Leventhal's opinions.  The ALJ considered what Plaintiff told Dr. Leventhal and the conclusions Dr. Leventhal made as a result of what Plaintiff told him.  He attributed little weight to the opinions of Dr. Leventhal as they do not reflect that Plaintiff sporadically sought medical health treatment, that the medical records did not show that she was disabled by a medical impairment that lasted for a continuous twelve-month period and she consistently failed to follow prescribed treatment without good reason (Docket No. 10, Attachment 2, pp. 23, 25 of 30).

The ALJ was required to consider Dr. Leventhal's opinions, give appropriate weight to Dr. Leventhal's opinions and explain the weight given to Dr. Leventhal's opinions.  He complied with these rules.  Relying on the correct legal standard, the ALJ arrived at a decision about the weight to give Dr. Leventhal's opinions based on the evidence.

X.  ANALYSIS OF PLAINTIFF'S DAILY ACTIVITIES.

Plaintiff argues that the ALJ erred in equating her ability to engage in daily activities with an ability to engage in competitive employment

A.  USE OF DAILY ACTIVITIES STANDARD OF REVIEW.

When a disability determination that would be fully favorable to the claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms in conjunction with the balance of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7.  *Hahn*

21

*v. Astrue,* 2011 WL 1136231, 4 (N. D. Ohio 2011) (*citing* TITLES II AND XVI: EVALUATION OF

SYMPTOMS IN DISABILITY CLAIMS, SSR 96–7p, (July 2, 1996); SSR Lexis 4, 61 Fed. Reg. 34483,

34484–34485 (1990)).  These factors include consideration of the claimant's daily activities.  *Id.*  The

Sixth Circuit has determined that "somewhat minimal daily functions" are not comparable to typical

work activities.  *Evans v. Astrue*, 2009 WL 4506435, *4 (E. D. Mich. 2009) (*citing Rogers, supra,* 486

F. 3d at 248).  When examining the intensity and persistence of a claimant's symptoms, the ALJ can

examine the claimant's daily activities.  20 C. F. R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (Thomson

Reuters 2011).

### B.    APPLICATION OF THE USE OF DAILY ACTIVITIES TO PLAINTIFF'S CLAIM.

A review of the ALJ's decision reflects that he did not consider the activities of taking care of

herself or daily activities to be substantial gainful activity.  Instead, the ALJ measured these activities

and weighed them against the inconsistencies of Plaintiff's statements with respect to her limitations and

the activities she performed.  The ALJ used these facts to assess the severity of Plaintiff's impairments

and whether they could be expected to produce the alleged symptoms.  The comparison of these factors

was instrumental in showing that Plaintiff's allegations regarding the intensity, persistence and limiting

effects of her symptoms were not entirely credible.  In addition, the ALJ considered whether Plaintiff

had marked restrictions in activities of daily living consistent with the analysis in part B of 12.04 of the

Listing (Docket No. 10, Attachment 2, pp. 20, 24, 25 of 30).  This analysis of the extent to which

Plaintiff had marked restrictions in activities in daily living was imperative in determining whether

Plaintiff met the third step of the sequential evaluation.

Clearly the ALJ did not equate Plaintiff's daily activities to her ability to work.  He used the

recitation of daily activities in the three ways permissible under the regulations:  to assess the severity

of Plaintiff's impairments, to assess Plaintiff's credibility and to assess whether the restriction of daily activities was sufficient to meet the "B" criteria of the Listing.  Since the ALJ followed the rules for use of daily activities, these findings cannot be disturbed.

### XI. ANALYSIS OF LACK OF SUBSTANTIAL EVIDENCE CLAIM.

Plaintiff claims that the ALJ's psychological findings are not based on substantial medical evidence.  Instead, the ALJ formed his own medical opinion respecting Plaintiff's mental impairment.  Defendant contends that the ALJ's psychological findings are based on mostly normal mental status findings.

The ALJ found that Plaintiff claimed she was depressed, that she was prescribed Lexapro, a medication created and used to treat depression and that state agency reviewing psychologists Drs. Flynn and Leventhal opined that Plaintiff suffered from depression (Docket No. 10, Attachment 2, pp. 22, 23, 25 of 30).  Although the ALJ considered the sporadic medical treatment for mental health issues, the ALJ adopted the findings of Drs. Flynn, Leventhal and Kaplan that Plaintiff had a mental impairment, namely depression (Docket No. 10, Attachment 2, p. 24 of 30).  There is no objective medical evidence that shows the severity or intensity of Plaintiff's mental impairments.  Accordingly, the ALJ was unable to ascertain whether Plaintiff's mental impairment met or equaled the criteria of the Listing (Docket No. 10, Attachment 2, p. 20 of 30).

The Magistrate is persuaded that the ALJ did not rely on his own understanding of the extent and severity of Plaintiff's mental impairment.  He followed the rules and concluded that based on the medical evidence in the record, including Plaintiff's subjective complaints, Plaintiff had a mental impairment but it was not a severe mental impairment.  This decision is supported by the record evidence.

## XII.  CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Dated:  December 27, 2011


## XIII.  NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

24